1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| **LEOPOLDO PAUL VELASQUEZ,**<br><br>Petitioner,<br><br>**v.**<br><br><br>**SCOTT FRAUENHEIM, Warden,**<br><br>Respondent. | **Case No. 1:12-cv-01326 AWI MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

11
12
13
14
15
16
17

18      Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas

19   corpus pursuant to 28 U.S.C. § 2254. Respondent, warden of Pleasant Valley State

20   Prison, is hereby substituted as the proper named respondent pursuant to Rule 25(d) of

21   the Federal Rules of Civil Procedure. Respondent is represented by Kevin L. Quade of

22   the office of the California Attorney General. Petitioner declined magistrate judge

23   jurisdiction on August 29, 2012. (ECF No. 5.)

24   **I.      PROCEDURAL BACKGROUND**

25      Petitioner is currently in the custody of the California Department of Corrections

26   pursuant to a judgment of the Superior Court of California, County of Stanislaus,

27   following his conviction after jury trial on January 23, 2009, for first degree murder with

28   various enhancements, possession of a concealable firearm by an active street gang

1

1  member, carrying a firearm by an ex-felon, and active participation in a criminal street

2  gang. (Clerk's Tr. at 345-48.) On September 28, 2009, Petitioner was sentenced to an

3  indeterminate term of life without the possibility of parole plus twenty-five years to life in

4  prison. (Id.)

5       Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

6  District, on March 10, 2010. (Lodged Doc. 1.) On March 16, 2011, the appellate court

7  affirmed the conviction. (Lodged Doc. 4.) Petitioner's petition for review was summarily

8  denied by the California Supreme Court on June 22, 2011. (Lodged Docs. 5-6.)

9       Petitioner next sought collateral review of the petition by way of a petition for writ

10  of habeas corpus filed with the Stanislaus County Superior Court on August 16, 2012.

11  (Lodged Doc. 7.) The petition was denied on August 17, 2012. (Lodged Doc. 8.)

12  Petitioner then filed a petition for writ of habeas corpus with the Fifth District Court of

13  Appeal on December 18, 2013. (Lodged Doc. 9.) The petition was denied on February 6,

14  2014. (Lodged Doc. 10.) Petitioner returned to the Stanislaus County Superior Court and

15  filed a second petition on March 5, 2014. (Lodged Doc. 11.) The petition was denied on

16  March 11, 2014. (Lodged Doc. 13.)

17      Petitioner filed his federal habeas petition on August 15, 2012. (Pet., ECF No. 1.)

18  The petition raised four grounds for relief: 1) ineffective assistance of counsel for failing

19  to bring a written motion to suppress Petitioner's statements made during interrogation,

20  failing to move to suppress evidence obtained pursuant to a search warrant of

21  Petitioner's house, and for failing to articulate a coherent defense theory; 2) ineffective

22  assistance of counsel for failing to move to suppress Petitioner's conviction; 3)

23  ineffective assistance of counsel for failing to argue that Petitioner lacked the required

24  mental state for first degree murder; 4) that trial counsel was inebriated and slept

25  through portions of the trial; and 5) cumulative error.

26      Concurrently with his petition, Petitioner filed a motion to stay the matter while he

27  pursued state remedies. (ECF No. 2.) In the motion, Petitioner indicated that he had yet

28  to exhaust his state remedies with regard to claims two through five. (Id.) The Court

1   granted the stay on September 18, 2012. (ECF No. 7.) Over a year later on October 30,

2   2013, the Court ordered Petitioner to show cause why the stay should not be vacated.

3   (ECF No. 8.) On December 9, 2013, the Court ordered the stay vacated and dismissed

4   claims two through five without prejudice. (ECF No. 10.)

5         Respondent filed an answer to the petition on June 16, 2014. (Answer, ECF No.

6   24.) Petitioner filed a traverse on July 16. 2014. (Traverse, ECF No. 26.)

7   **II.**   **STATEMENT OF THE FACTS**[1]

8       **Testimony of Michael Jordan**

9         Appellant's friend, Michael Jordan, testified on behalf of the

10  prosecution. Appellant and Jordan were members of the Norteno criminal
    street gang. On July 9, 2006, appellant, Jordan, and their friend, Surjeet

11  "Surj" Singh, were drinking beer in front of the Jordan's Modesto home.
    After consuming a number of beers, they saw Ryan Chaffee, a member of

12  the rival Sureno criminal street gang, drive by in a "tannish-brownish" car.
    Appellant said, "There goes that Scrap," referring to Chaffee with a

13  derogatory term for a member of the Sureno gang. Appellant also said he
    wanted to "'blast those fools.'" Jordan saw that appellant had a small,

14  black semiautomatic weapon in his pocket. Appellant walked toward
    Ronald Avenue and crouched in an alleyway as he approached the corner

15  of Ronald and Waring. Jordan followed appellant to the alley and saw a lot
    of people in front of the house at 1830 Waring. Jordan persuaded

16  appellant not to discharge the firearm and the two men returned to
    Jordan's front yard where they continued to drink beer with Singh.

17        Sometime later, appellant and Singh drove Singh's car to Chaffee's
    house on Waring Way. About five minutes later they returned to the area

18  of Jordan's home and parked Singh's car a few houses away from
    Jordan's. Appellant got out of Singh's car and began walking quickly

19  toward Ronald Avenue. Jordan suspected that appellant was returning to
    the house on Waring. Jordan followed appellant to try to dissuade him

20  from using the weapon. When appellant reached the corner of Ronald and
    Waring, he removed his Oakland Raiders jersey, wrapped it around his

21  hand, and discharged the revolver four or five times down Waring.
    Appellant's shots killed Chaffee's 17-year-old neighbor, Jason Bender.

22  Chaffee said Jason and two others were walking from his driveway to the
    corner of Waring Way and Ronald Avenue when the shots rang out. Police

23  arrived on the scene about three minutes later, at about 1:40 a.m.
    Appellant and Singh ran back to Singh's Lincoln and drove off. Jordan ran

24  to his home, told his father what happened, but did not call the police. The
    police nevertheless arrested him the following day.

25        Jordan initially denied any knowledge of the shooting because he

26

---

27  [1] The Fifth District Court of Appeal's summary of the facts in its March 16, 2011 opinion is presumed
    correct. 28 U.S.C. § 2254(e)(1).

28

feared retribution by fellow gang members. He ultimately identified appellant as the shooter by writing his name on a piece of paper and drawing a picture of appellant's hairstyle. Sometime after 6:00 p.m. on July 10, 2006, police arrested appellant. He was dressed in a black Oakland Raiders jersey bearing the number 24. At about 8:00 p.m., police officers executed a search warrant at appellant's home on Clayton Avenue in Modesto. They found a .25-caliber semiautomatic pistol, a gun magazine, red clothing, a Raiders jersey, and a letter addressed to appellant.

**Testimony of Dr. Pakdaman**

Parviz Pakdaman, M.D., a forensic pathologist, conducted an autopsy of Bender's body on July 10, 2006. Dr. Pakdaman said a bullet pierced Bender's right arm and right chest cavity and caused great damage to the heart and lungs as well as massive bleeding. Dr. Pakdaman removed a single bullet projectile from Bender's left chest wall and submitted it to police.

**Testimony of Criminalist Ronald Welsh**

Ronald Welsh, a senior criminalist with the California Department of Justice, analyzed and compared the spent .25-caliber shell casings recovered at the crime scene with the handgun recovered at appellant's home and conducted test-firings of the weapon. Welsh concluded the expended cartridge cases were fired from the .25-caliber automatic pistol recovered at appellant's home.

**Testimony of Detective Henry Dodge Hendee**

Modesto Police Detective Henry D. Hendee testified he was the lead detective in the investigation of the death of Jason Bender. Detective Hendee interviewed appellant for several hours after his arrest on July 10, 2006. The interview was recorded and transcribed. After advising appellant of his Miranda[1] rights, Hendee asked appellant about the last time he had fired a gun. Appellant said it was a "[l]ong time ago." Appellant denied being a member of a gang but only "claimed" that he was a "Northerner." Appellant also said the subject gun came from a friend of appellant's brother, Gabriel. Appellant told Hendee the friend handed the gun to appellant at Gabriel's Clayton Avenue house on July 1. The gun came with one clip. Appellant took the gun and placed it in his black leather coat. Appellant said he eventually gave the gun to his mother for safekeeping. Appellant admitted firing the gun one time in front on his home on the evening of July 4. Appellant denied knowing anyone who drives a light blue Cadillac, Lincoln Continental, or Lincoln Town Car.

Hendee accused appellant of involvement in the shooting at Waring Way and Ronald. Appellant then admitted shooting six shots from the gun in the air. Appellant said other people were present, but he declined to give their names. Appellant said he fired the shots and then he and the others ran away. Appellant said he fired the shots to scare some people who were standing on a nearby street corner. Appellant did not know if they were gang members but explained he fired because "[t]hey tried to

[1] Miranda v. Arizona (1966) 384 U.S. 436 (Miranda).

4

creep up on us, on ah, on me." Appellant said he was not aware that someone was hit with a bullet because he fired the gun in the air. Appellant thought the men on the corner had a gun because they fired a round from what appellant thought was a .22-caliber weapon. Appellant admitted he was drunk at the time of the firing and discharged the weapon to "just scare them fools." He ultimately acknowledged that he knew a "scrap" lived in the vicinity of the shooting and that he discharged the weapon to scare the "scrap." Appellant said he had a problem with a "scrap" because the latter tried to shoot appellant on a prior occasion.

**Testimony of Detective Sean Martin**

Detective Martin testified he assisted Detective Hendee on July 10, 2006, by driving appellant to the Doctors Medical Center for the drawing of blood and by transporting appellant to the Stanislaus County Jail for booking. Intake deputies asked whether the victim of the crime was a Sureno. Detective Martin then asked appellant, "'Is that right?'" Appellant replied, "'Yeah, that's right.'" The intake deputies then asked whether appellant was a Norteno. Appellant replied in the affirmative and said he had been a Norteno since he was 12 or 13 years old.

**Testimony of Detective James V. Rokaitis**

Modesto Police Detective James V. Rokaitis testified he had served with the Gang Intelligence Task Force. Detective Rokaitis conducted a "gang workup" on the appellant and described eight contacts between appellant and law enforcement officers. Rokaitis said appellant was an admitted and documented member of the Norteno criminal street gang between 2002 and 2006. In Rokaitis's view, appellant was an active Norteno criminal street gang member on the date of the shooting. Rokaitis based his conclusion on his prior association with gang members; his association with gang members on the day of the shooting; his hairstyle, tattoos, and clothing; his prior admissions of gang membership to law enforcement officers; and his admission of gang membership at the time of intake at the Stanislaus County Jail.

Detective Rokaitis testified that Jason Bender's neighbor, Ryan Chaffee, was a member of the Sureno criminal street gang and that appellant's actions benefited the Norteno criminal street gang. Rokaitis explained:"[F]ear and intimidation both directed at rival gang members and the surrounding community is what allows gangs to exist. So these violent acts, acts of carrying weapons, putting beat downs, stabbings, shootings on rival gang members, doesn't just instill fear or this concept of respect in rival gangs but also the surrounding neighborhood, and that's how they maintain control and enhance the reputation of their criminal street gang."

**Defense Evidence**

Defense investigator Donald E. Elder testified he interviewed David A. Gonzalez, an inmate at Stanislaus County Jail, on October 31, 2008. Gonzalez told Elder he shared a jail cell with appellant's friend, Michael Jordan. According to Elder, Jordan was in custody on a drunken driving charge. During their incarceration, Jordan told Gonzalez that appellant was not the shooter on July 10, 2006. According to Gonzalez, Jordan claimed that he—not appellant—was the one who shot Jason Bender. Jordan further told Gonzalez that Jordan's cousin, Robert Torres,

5

instructed Jordan to carry out the shooting.

Elder testified he was a former Monterey Park police officer and employee of the California Youth Authority and Department of Corrections. He previously worked as a parole agent for prison gang members. In Elder's view, the homicide of Jason Bender "was committed for the benefit of Michael Jordan. It was not a Norteno-committed crime.... Michael Jordan and Michael Jordan's brother had a confrontation with the Bender family. This was a Michael Jordan problem. It was not a Norteno problem."

People v. Velasquez, 2011 Cal. App. Unpub. LEXIS 1989, 1-10 (March 16, 2011).

## II.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

### B.   Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as

6

1

2

determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3

28 U.S.C. § 2254(d).

4

1.    Contrary to or an Unreasonable Application of Federal Law

5

6

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner"  Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'"  Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable."  Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)).  Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

2   Federal law for a state court to decline to apply a specific legal rule that has not been

3   squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

4   (2009), quoted by Richter, 131 S. Ct. at 786.

5                      2.   Review of State Decisions

6        "Where there has been one reasoned state judgment rejecting a federal claim,

7   later unexplained orders upholding that judgment or rejecting the claim rest on the same

8   grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

9   "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

10   (9th Cir. 2006).  Determining whether a state court's decision resulted from an

11   unreasonable legal or factual conclusion, "does not require that there be an opinion from

12   the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85.

13   "Where a state court's decision is unaccompanied by an explanation, the habeas

14   petitioner's burden still must be met by showing there was no reasonable basis for the

15   state court to deny relief."  Id. ("This Court now holds and reconfirms that § 2254(d) does

16   not require a state court to give reasons before its decision can be deemed to have been

17   'adjudicated on the merits.'").

18        Richter instructs that whether the state court decision is reasoned and explained,

19   or merely a summary denial, the approach to evaluating unreasonableness under §

20   2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

21   or theories supported or, as here, could have supported, the state court's decision; then

22   it must ask whether it is possible fairminded jurists could disagree that those arguments

23   or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786.

24   Thus, "even a strong case for relief does not mean the state court's contrary conclusion

25   was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

26   authority to issue the writ in cases where there is no possibility fairminded jurists could

27   disagree that the state court's decision conflicts with this Court's precedents."  Id.  To put

28   it yet another way:

8

1

2

3

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

4    Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

5    are the principal forum for asserting constitutional challenges to state convictions." Id. at

6    787. It follows from this consideration that § 2254(d) "complements the exhaustion

7    requirement and the doctrine of procedural bar to ensure that state proceedings are the

8    central process, not just a preliminary step for later federal habeas proceedings." Id.

9    (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

10                    3.      Prejudicial Impact of Constitutional Error

11         The prejudicial impact of any constitutional error is assessed by asking whether

12   the error had "a substantial and injurious effect or influence in determining the jury's

13   verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

14   U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

15   state court recognized the error and reviewed it for harmlessness).  Some constitutional

16   errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v.

17   Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

18   (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective

19   assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

20   Strickland prejudice standard is applied and courts do not engage in a separate analysis

21   applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin

22   v. Lamarque, 555 F.3d at 834.

23   **III.    REVIEW OF PETITION**

24         **A.    Unexhausted Claims**

25         As discussed above, Petitioner sought to stay this federal petition while he sought

26   to exhaust his state remedies with regard to claims two through five. The Court granted

27   the request to stay the petition, however over a year passed without Petitioner taking

28   appropriate action to exhaust the claims. Accordingly, the Court vacated the stay, and

1  dismissed claims two through five of the petition. Those claims are not present for

2  adjudication.

3      However, even if they were, Petitioner, in his traverse, urges the Court to wait to

4  address these claims while a petition filed with the California Supreme Court is pending.

5  (ECF No. 26.) Petitioner has not presented any evidence that he has a petition currently

6  pending with the California Supreme Court. The electronic docket available at the

7  California Supreme Court website does not show that Petitioner has a petition pending

8  before that court. Those claims will not be reviewed by this Court. Should petitioner

9  exhaust these claims in state court he can seek relief by way of a second federal petition

10  to address those claims.

11      **B.   Claim One: Ineffective Assistance of Counsel**

12      In Petitioner's sole exhausted claim, he presents three arguments as to how trial

13  counsel was ineffective. Specifically, Petitioner claims that counsel was ineffective for

14  failing to bring a written motion to suppress Petitioner's conviction, failing to move to

15  suppress evidence obtained pursuant to a search warrant of Petitioner's house, and for

16  failing to articulate a coherent defense theory. (Pet. at 4.)

17      1.   Law Applicable to Ineffective Assistance of Counsel Claims

18      The law governing ineffective assistance of counsel claims is clearly established

19  for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).

20  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998).  In a petition for writ of habeas

21  corpus alleging ineffective assistance of counsel, the Court must consider two factors.

22  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry

23  v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's

24  performance was deficient, requiring a showing that counsel made errors so serious that

25  he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

26  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell

27  below an objective standard of reasonableness, and must identify counsel's alleged acts

28  or omissions that were not the result of reasonable professional judgment considering

the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 687; see also, Harrington v. Richter, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694.  Petitioner must show that counsel's errors were "so serious as to deprive defendant of a fair trial, a trial whose result is reliable."  Id. at 687.  The Court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1348; United States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.  However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance.  Id. at 692; United States v. Cronic, 466 U.S., at 659, and n. 25 (1984).

As the Supreme Court reaffirmed recently in Harrington v. Richter, meeting the standard for ineffective assistance of counsel in federal habeas is extremely difficult:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Williams, supra, at 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a deference and latitude that are not in operation when the case involves

review under the <u>Strickland</u> standard itself.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid.</u> "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251, 261 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 131 S. Ct. at 785-86.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> at 786. "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." <u>Id.</u> "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 786-87.

Accordingly, even if Petitioner presents a strong case of ineffective assistance of counsel, this Court may only grant relief if no fairminded jurist could agree on the correctness of the state court decision.

## 2.   State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in a subsequent petition for review by the California Supreme Court. (<u>See</u> Lodged Docs. 4, 6.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court

agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the California Court of Appeal explained:

## I.   DEFENSE COUNSEL DID NOT RENDER INEFFECTIVE ASSISTANCE AT TRIAL

Appellant contends his defense counsel was ineffective at trial on several legal grounds.

### A. Procedural History of Ineffectiveness Claim

On June 10, 2009, the court relieved appellant's trial counsel and appointed new counsel for the preparation of a motion for new trial. On September 15, 2009, appellant's newly-retained counsel filed a motion for new trial (§ 1181) alleging ineffective assistance of his trial counsel based upon 18 separate grounds. On September 24, 2009, the prosecution filed written opposition to the motion for new trial. On September 28, 2009, the court conducted a contested hearing on the motion and heard the arguments of counsel. The court denied the motion, stating:

"[T]he Court did in fact hear the trial and the evidence in this case. And, frankly, it's the Court's opinion that while Mr. Trimble's defense may have not been artistically perfect, it was about as well as he could do, considering the strength of the case against him.

"This was a case which was extremely strong against the defendant. The defendant confessed, in essence, to many of the elements of the crime; admitted to being the shooter.... [T]here was really no doubt that the defendant was the shooter; he was the person that committed the crime. The evidence was overwhelming on that point.

"The only thing that could be done would be either try to reduce the degree of the offense or to attempt to attack the gang enhancement, which was the part of the case which made the case a special circumstance case, subject to the life imprisonment without possibility of parole.

"In that area Mr. Trimble did in fact get the services of a gang expert. I think the gang expert could not reasonably have presented a case that Mr. Velasquez was not a member of a gang. They sought during the course of trial and the gang expert's testimony and Mr. Trimble's argument to argue that the offense, even though Mr. Velasquez was a member of a gang, was not ... committed for the benefit of

the gang, which was the crucial element, the jury did not buy that, but they were not incompetent in trying to raise that.

"All in all, the Court finds that ... whatever the deficiencies of Mr. Trimble's advocacy in the case ... a better result would not have been achieved by someone else raising all of the things that could have been raised in this particular case.

"The motion for new trial is denied on all grounds. The court specifically finds that the defendant's statement was legally taken, was not in violation of the Miranda principles, and that the evidence that witnesses were in witness protection were not unduly ... prejudicial and would not have changed the outcome of the case had they been absent."

## B. Governing Law

The right to counsel protects the due process right to a fair trial not only by guaranteeing "access to counsel's skill and knowledge" but also by implementing the constitutional entitlement to an "'ample opportunity to meet the case of the prosecution.'" (Strickland v. Washington (1984) 466 U.S. 668, 684-686 (Strickland).) To establish ineffective assistance, the defendant must show that counsel's performance "fell below an objective standard of reasonableness" and prejudiced the defense. (Id. at pp. 687-692; People v. Ledesma (1987) 43 Cal.3d 171, 216-217 (Ledesma).) To establish prejudice, the defendant must make a showing "sufficient to undermine confidence in the outcome" of a "reasonable probability" that, but for counsel's performance, "the result of the proceeding would have been different." (Strickland, supra, at pp. 693-694; Ledesma, supra, at pp. 217-218.) A reviewing court can adjudicate an ineffective assistance claim solely on the issue of prejudice without evaluating counsel's performance. (Strickland, supra, at p. 697.)

"In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (People v. Williams (1997) 16 Cal.4th 153, 214-215.) Generally, the failure to object is considered a matter of trial tactics "as to which we will not exercise judicial hindsight. [Citation.]" (People v. Kelly (1992) 1 Cal.4th 495, 520.) In California, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (Strickland, supra, 466 U.S. at p. 689; People v. Lucas (1995) 12 Cal.4th 415, 436-437.)

## C. Appellant's Specific Contentions

On appeal, appellant contends his trial counsel was deficient on three separate legal grounds: (1) by failing to file a separate written motion

pursuant to Evidence Code section 402 for exclusion of his taped statement to police as violative of <u>Miranda v. Arizona</u>, supra, 384 U.S. 436; (2) by failing to file a written motion pursuant to Penal Code section 1538.5 to exclude admission of the alleged murder weapon and gang-related evidence seized by police during the search of appellant's home; and (3) by failing to mount "a clear and coherent defense" throughout the trial.

## D. Discussion

### 1. Evidence Code Section 402

Appellant contends his trial counsel was deficient by failing to file a motion to exclude evidence of his taped statement to police because his alleged waiver of Miranda rights was not voluntary, knowing, or intelligent.

On January 13, 2009, defense counsel filed a single written pleading encompassing multiple motions in limine. The written motions stated in relevant part:

"6. The defendant in the above-entitled action moves that the Court issue an order before voir dire examination to instruct the witness not to give, and the prosecutor not to elicit testimony concerning the alleged confession. An evidentiary hearing is requested under Evidence Code § 402 if the people seek to bring in any statements of the defendant."

On January 14, 2009, during the time set aside for in limine motions, the court expressly acknowledged:

"First of all, there was a request by Defense [pursuant to an Evidence Code section] 402 motion as to the voluntariness of the defendant's confessions or admission and whether or not [appellant] was properly warned under the Miranda decision. [¶] The Court has reviewed the transcript of the defendant's interrogation ... and viewed the video disks of the interrogation."

The court found that appellant "was properly advised of his rights under the Miranda decision and waived those rights voluntarily, intelligently."

Appellant's claim of ineffectiveness based on trial counsel's purported failure to "file a separate written motion pursuant to Evidence Code section 402" is not supported by the record.

As to the propriety of the trial court's ruling on the section 402 motion, we note Detective Hendee explained the purposes of the interview [2] and advised appellant of his rights under Miranda at the inception of the July 10, 2006 interview. After Hendee recited each right,

---

[2] Hendee specifically advised appellant: "Okay. Well what we wanted to do, there was a ... shooting ... early this morning, okay, and we've been talkin' to a lotta people about it and we wanna ask you some questions about it, see if you know anything about that. Ah, okay, you understand that?" Appellant replied, "Yes sir."

15

he asked appellant, "[D]o you understand that right?" Appellant replied, "Yes sir," to each such question. Hendee then asked, "Having these [Miranda] rights in mind ... we want to ask you some questions about if you know anything about this [offense], do you mind talking to us?" Appellant first replied, "Huh?" Hendee then asked, "Do you mind talking to us?" Appellant responded, "Oh yeah." In the motion for new trial, counsel argued that appellant said he did "mind" talking to officers and questioning should have immediately stopped. Counsel asserted the continued questioning of appellant violated appellant's Fifth Amendment right against self-incrimination.

We have independently reviewed the transcript and DVD of the July 10, 2006, police interview of appellant. At the "21:48:25" mark of the DVD, after the recitation of rights, Detective Hendee asked appellant, "Do you mind talking to us?" Appellant responded with a nod of his head, an affirmative gesture with his hand, and the apparent words "go ahead" in a soft voice.[3] The record reflects that trial counsel moved in limine under Evidence Code section 402 to exclude the transcript and DVD of appellant's July 10, 2006, interview. Upon examination of the DVD and transcript, the trial court found that appellant waived his Miranda rights voluntarily and intelligently. Our independent examination of the DVD and transcript supports the trial court's findings. Counsel did not render ineffective assistance with respect to appellant's statements on July 10, 2006.

**2. Section 1538.5**

Appellant contends his trial counsel was deficient by failing to obtain a copy of the search warrant affidavit before trial and by failing to timely file a written motion under section 1538.5 to suppress evidence elicited during that search. He specifically contends defense counsel's "vague objections to the evidence seized at the house" did not properly preserve any legal objections under state or federal constitutional law to the search warrant itself or to the manner in which the warrant was served and executed.

**a. Contents of the Search Warrant and Affidavit**

Since appellant's contention is predicated on the warrant, this court has summoned the superior court file and independently reviewed the four-page search warrant and the 13-page affidavit upon which it is based.

At 9:05 p.m. on July 10, 2006, the Honorable Susan Siefkin, Judge of the Stanislaus County Superior Court, issued a warrant for the search of premises (including attached and detached structures) at 1805 Clayton Avenue in Modesto; a 1995 Dodge Dakota (Cal. Lic. No. 5A97549) and other vehicles under control of the occupants of 1805 Clayton Avenue; and the person of Leopoldo Paul Velasquez. The warrant commanded executing officers to seek a weapon capable of firing a .25-caliber cartridge and all weapons presenting a direct threat to law enforcement officers, including ammunition for such weapons. The warrant also

---

[3] The reporter's transcript of the interview reflects that appellant said, "Oh yeah" in response to Detective Hendee's question, "Do you mind talking to us?" However, screening of the DVD reveals that appellant quietly said, "Go ahead."

commanded executing officers to seek evidence of street gang membership or affiliation and cellular and cordless telephones containing files, data, images, software, and operating systems, among other things.

The search warrant was based on the affidavit of Steven P. Jacobson, a criminal investigator with the Stanislaus County District Attorney's Office. Investigator Jacobson set forth his law enforcement education, training, and experience and averred that he spoke with or received information—which was described in some detail—from more than a dozen named law enforcement officers with respect to the homicide of Jason Bender. The affidavit set forth in detail the statements of a percipient citizen witness to events taking place in and around the scene of the homicide. The affidavit specifically noted that Modesto Police Detective Hendee began interviewing Jordan at 12:50 p.m. on July 10. Jordan waived his Miranda rights and Hendee advised that Jordan was a witness to the murder of Jason Bender and was one of three subjects identified by the citizen witness. Jordan identified the other two subjects as appellant and a male named "Serg" (sic) or "Javier." Jordan told Detective Hendee that appellant was the one who shot Jason Bender approximately five times. Jordan also said that "Serg" (sic) was the driver of a light blue four-door Cadillac or Lincoln Town Car that they used to drive around the block. Jordan told Hendee that prior to the shooting, appellant took out a .25-caliber semiautomatic handgun from his pants pockets and showed Jordan the weapon. According to Jordan, appellant said he wanted to shoot a "scrap."

**b. The Law Governing Validity of Search Warrants**

In reviewing a search conducted pursuant to a warrant, an appellate court inquires whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. The task of the issuing magistrate is to make a practical common-sense decision whether there is a fair probability that contraband or evidence of a crime will be found in a particular case. In make that determination, the magistrate must consider the veracity and basis of knowledge of persons supplying hearsay information. The magistrate's determination of probable cause is entitled to deferential review. Probable cause sufficient for issuance of a warrant requires a showing that makes it substantially probable that there is specific property lawfully subject to seizure located in at the particular place for which the warrant is sought. That showing must appear in the affidavit in support of the warrant. (People v. Carrington (2009) 47 Cal.4th 145, 161.)

A search warrant must be supported by probable cause. (§ 1525.) In determining whether probable cause exists, the magistrate considers the totality of the circumstances. Probable cause may be shown by evidence that would not be competent at trial. Accordingly, information and belief alone may support the issuance of search warrants. Because search warrant affidavits are often written by nonlawyers in the midst of an investigation, technical requirements for elaborate specificity are not required in their review of such affidavits. A magistrate may reasonably rely on the special experience and expertise of the affiant officer in considering whether probable cause exists. In a particular case it may be difficult to determine when an affidavit demonstrates the existence of probable cause. The resolution of doubtful or marginal cases should be largely determined by the preference accorded to warrants. A court

reviewing the issuance of a search warrant defers to the magistrate's finding of probable cause unless the warrant is invalid as a matter of law. (People v. Varghese (2008) 162 Cal.App.4th 1084, 1103-1104.)

**c. Appellant's Contention**

In the instant appeal, appellant contends trial counsel was deficient with respect to section 1538.5 by failing to file a written motion to exclude admission of the alleged murder weapon[4] and gang-related evidence seized from his home. We cannot determine whether appellant is concerned with the validity of the warrant, the execution of the warrant, or some other matter relating to the detection, identification, and seizure of contraband at appellant's home. "To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him. [Citations.]" (People v. Hawkins (1995) 10 Cal.4th 920, 940, disapproved on another point in People v. Lasko (2000) 23 Cal.4th 101, 110.) "If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (People v. Scott (1997) 15 Cal.4th 1188, 1212.)

Appellant insists that instead of filing a timely section 1538.5 motion, counsel made "vague objections to the evidence seized at the house during the testimony of [O]fficer Owen" and two other officers. During the testimony of Officer Philip Owen, the court noted that testimony relating to the seized items was "[s]ubmitted subject to objection under 1538.5." The court reaffirmed that point during the testimony of Officers Paul Kirchoff and Douglas Ridenour, Jr. Appellant contends these objections were "completely inadequate as a matter of law" and did not preserve the search and seizure issue for appeal. However, appellant fails to show how the warrant or the search and seizure pursuant to the warrant violated the Fourth Amendment under the facts and circumstances of this case. To demonstrate counsel was constitutionally ineffective, an appellant must make an affirmative showing counsel failed to act in a reasonable manner and that there was a reasonable probability the outcome would have been different if counsel acted reasonably. (Ledesma, supra, 43 Cal.3d 171, 217.)

Our review of the affidavit in support of Judge Siefkin 's search warrant reveals a point-by-point, step-by-step recitation of facts describing the events leading to the homicide, the homicide itself, and the law enforcement response to commission of the crime. Each sequence of facts was specifically related to a day, time, and a named witness or investigative officer. Investigator Jacobson's affidavit described the evidence sought and the premises searched with great particularity. The affidavit specifically noted Michael Jordan's inculpatory statements to Detective Hendee, especially his attribution of criminal liability to the appellant. The affidavit was more than sufficient to establish a connection

---

[4] Appellant mentions the weapon in his opening brief on appeal but does not suggest any specific evidentiary or constitutional grounds for the suppression of the weapon.

between the conduct of appellant and the death of Jason Bender. In light of these facts and circumstances, we cannot conclude that defense counsel rendered ineffective assistance by declining to file a written suppression motion under section 1538.5. The Sixth Amendment does not require counsel to file futile motions. (People v. Memro (1995) 11 Cal.4th 786, 834.) The Ninth Circuit Court of Appeals has aptly noted:"[The proposition that a defendant has everything to gain and nothing to lose in filing a motion to suppress] suggests that a lawyer should file a suppression motion in every case, because the defendant has nothing to lose and the lawyer can never be certain that the judge will not suppress the evidence against his client. We have rejected that argument where the motion would be without merit.... A lawyer's zeal on behalf of his client does not require him to file a motion which he knows to be meritless on the facts and the law. Also, the premise that the defendant has nothing to lose by such a motion is false. The defendant stands to lose two things of value — a significant quantity of his lawyer's scarce time, and some of his lawyer's credibility with the judge. Lawyers are not called 'counsel' for nothing. The judge is counseled by the lawyers as to how he should proceed. The attentiveness with which the judge listens to the lawyers' advice is tempered by his judgment about the credibility of the particular lawyer. An unmeritorious motion to suppress may cost the particular defendant some deference by the judge to his lawyer's advice on other issues later in the case. It will certainly costs the particular defendant the time his lawyer wastes in the library and at his desk generating valueless paper, when he could be working on better motions, interviewing witnesses, examining locations and evidence, researching likely evidentiary issues, and preparing for trial." (Lowry v. Lewis (9th Cir. 1994) 21 F.3d 344, 346.)

In view of our independent examination of the search warrant and supporting affidavit, we cannot say trial counsel's the representation fell below an objective standard of reasonableness under prevailing professional norms. Appellant's ineffective assistance claim must be rejected with respect to the failure to file a section 1538.5 motion.

**3. Presentation of Defense**

Appellant contends his trial counsel kept changing his defense strategy during trial "thereby resulting in a rambling, incoherent closing argument where he changed his defense theory two or three times."

A criminal defendant is entitled to the effective assistance of counsel during closing argument. (Yarborough v. Gentry (2003) 540 U.S. 1, 5.) Defense counsel must not argue against his or her client. (People v. Lucas, supra, 12 Cal.4th 415, 446.) Nevertheless, the decision of how to argue to the jury after the presentation of evidence is inherently tactical. To that end, the Supreme Court has recognized the importance of counsel maintaining credibility before the jury. Thus, the Supreme Court has repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt. (People v. Freeman (1994) 8 Cal.4th 450, 498.) The Supreme Court has specifically rejected claims of ineffective assistance in cases involving concessions made by defense counsel in closing argument, where the incriminating evidence was strong and counsel offered some other choice in the defendant's favor. (People v. Hart (1999) 20 Cal.4th 546, 630-631.)

A review of defense counsel's closing argument reveals the following sequential topics: gratitude to members of the jury for their service; the forms of verdict and differences between first and second degree murder; the veracity and credibility of Michael Jordan; the prosecution's burden of proof; the jury instructions relating to voluntary intoxication, imperfect self-defense and the types of homicide; appellant's inability to premeditate and deliberate on the evening in question due to intoxication; and the inapplicability of the gang enhancement.

Although appellant characterizes his counsel's argument as "rambling, incoherent," a careful reading reveals that counsel covered a multitude of topics arising during the trial. Appellant insists "[t]he main deficiency of counsel's closing argument was that he argued several different defenses." Appellant also faults his counsel for losing his place in his written notes during argument and for apparently crying and losing his composure when he shared a childhood anecdote about his own mother and the presence of a firearm in their rural home.

As respondent points out, counsel's decision to present alternative defenses was objectively reasonable under all of the facts and circumstances. Counsel attacked Michael Jordan's credibility and pointed out Jordan's motive for lying and blaming the homicide on appellant. Given appellant's highly inculpatory statements to Modesto detectives during his filmed interview on July 10, counsel argued for a lesser offense and maintained his client could not have formed the requisite intent for first degree murder because of severe intoxication. The evidence against appellant was strong, and counsel's argument offered some choices in his client's favor. Thus, the presentation of alternative defenses or the concession of certain points during argument did not amount to ineffective assistance. (People v. Hart, supra, 20 Cal.4th at p. 631.)

As to counsel's loss of composure during the sharing of an anecdote, the jury must face its obligation soberly and rationally and should not be given the impression that emotion may reign over reason. In each case, the trial court must strike a careful balance between the probative and the prejudicial. (People v. Haskett (1982) 30 Cal.3d 841, 864.) In the instant case, the trial court granted a brief recess when defense counsel lost his composure while recounting a childhood anecdote about his own mother. The mere expression of emotion during closing argument did not amount to ineffective assistance and, in some respects, may have led jurors to empathize with the defendant and place his version of events in a more favorable light in their eyes.

We do not find ineffective assistance on this record.

People v. Velasquez, 2011 Cal. App. Unpub. LEXIS 1989, 1-30 (Mar. 16, 2011).

### 3. Failure to File a Written Motion to Supress Interrogation

Petitioner first claims that counsel was ineffective for failing to file a written motion to supress his taped statement to police. He asserts that he did not waive his Miranda rights before speaking with law enforcement officers. The crux of Petitioner's argument is that he responded to the question, "Do you mind talking to us?" by stating "Oh yeah" and

1    thereby indicating he did not desire to talk and thus was invoking his right to silence.

2         In denying the claim, the state appellate court stated that it reviewed the record

3    and found that the detective explained to Petitioner that they wanted to talk about the

4    shooting that occurred. The Court also found that the detective advised Petitioner of his

5    Miranda rights, and that Petitioner responded "Yes sir" to each question.

6         Rather than finding that Petitioner said "Oh, yeah" when asked if he minded

7    talking to the police, the appellate court reviewed a video of the questioning and found

8    that Petitioner instead "responded with a nod of his head, an affirmative gesture with his

9    hand, and the apparent words 'go ahead' in a soft voice." Accordingly, the state court

10   found that Petitioner voluntarily waived his Miranda rights, and that counsel was not

11   ineffective for failing to draft and file a frivolous motion.

12        Petitioner does not challenge the state court's finding that he answered

13   affirmatively by stating "Yes sir" as to whether he understood his Miranda rights. (See

14   Clerk's Tr. at 359.) With regard to whether Petitioner stated 'oh yeah' as opposed to 'go

15   ahead' when asked if he wanted to speak about the shooting, Petitioner only repeats the

16   arguments previously made in his state appeal and does not attempt to address how the

17   state court's determination of the facts was unreasonable.

18        In addition, even if Petitioner stated 'oh yeah,' such statement would not be an

19   unambiguous invocation of his right to remain silent. The police may interrogate a

20   suspect only if there is a voluntary, knowing, and intelligent waiver of constitutional

21   rights. Patterson v. Illinois, 487 U.S. 285, 292, 108 S. Ct. 2389, 101 L. Ed. 2d 261

22   (1988); Miranda, 384 U.S. at 444. "Any waiver, express or implied, may be contradicted

23   by an invocation at any time. If the right to counsel or the right to remain silent is invoked

24   at any point during questioning, further interrogation must cease." Berghuis v.

25   Thompkins, 560 U.S. 370, 130 S. Ct. 2250, 2263-64, 176 L. Ed. 2d 1098 (2010). A

26   suspect "need not utter a 'talismanic phrase' to invoke his right to silence." Hurd v.

27   Terhune, 619 F.3d 1080, 1089 (9th Cir. 2010) (citing Arnold, 421 F.3d at 866).

28   Nonetheless, a suspect who wishes to invoke his right to silence must do so

1   "unambiguously." Thompkins, 130 S. Ct. at 2260; see also Hurd, 619 F.3d at 1088

2   ("Thompkins makes clear that a criminal defendant must affirmatively and

3   unambiguously invoke his right to remain silent if he wishes to cut off police

4   interrogation.")

5           It is possible that the statement 'oh yeah' could be construed as an affirmative

6   response, but it is not strong statement of affirmance. It could have been a statement

7   confirming that Petitioner heard the statement made by the detective. Even if Petitioner

8   had meant the statement to mean that he did not want to talk, the transcript shows he

9   proceeded to do so anyway, without mentioning that his response meant that he did

10  indeed mind talking. (See Clerk's Tr. at 359.) Providing the state court decision with

11  appropriate deference, there is at least a possibility that fair-minded jurists could agree

12  with the state court decision that Petitioner did not invoke his right to silence and that

13  counsel was not ineffective for failing to file a written motion to suppress the

14  interrogation. Petitioner has not shown that trial counsel was ineffective. Moreover,

15  Petitioner has not met his burden of showing that but for counsel being ineffective, there

16  was a "reasonable probability that… the result ... would have been different." Strickland,

17  466 U.S. at 694. Here, the prosecution presented strong evidence of Petitioner's guilt

18  based on the testimony of his co-defendant Michael Jordan, and from the physical

19  evidence, including a firearm linking Petitioner to the shooting. Fairminded jurists could

20  therefore disagree with the correctness of the state court decision that counsel's failure

21  to move to suppress the interrogation evidence as not "so serious as to deprive

22  defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 487.

23  Petitioner's first claim of ineffective assistance of counsel is without merit.

24          4.      Failure to File a Motion to Supress Evidence Obtained from Search

25  Warrant

26          Petitioner next claims that counsel was ineffective for failing to move to supress

27  evidence found during a search of his residence. In denying Petitioner's claim, the state

28  court found that the warrant was properly prepared and based on sufficient evidence,

1  including the statements of Michael Jordan, implicating Petitioner in the offense. While

2  Petitioner argues that trial counsel did not properly file a written motion to attempt to

3  supress the evidence, Petitioner fails to describe how the search warrant was deficient.

4  The state court denied the claim based on that precise reason – it found that the

5  "affidavit was more than sufficient to establish a connection between the conduct of

6  appellant and the death of Jason Bender" and that counsel was not required to file futile

7  motions. (Lodged Doc. 4 at 7-10.)

8      The state court was reasonable in finding that trial counsel's conduct did not fall

9  below an objective standard of reasonableness in not attempting to supress the

10  evidence found during the search. Provided the highly deferential review of counsel's

11  conduct, the Court finds that counsel's conduct fell within the wide range of reasonable

12  professional assistance in not challenging the warrant which appears properly obtained.

13  Strickland, 466 U.S. at 687; see also, Harrington v. Richter, 131 S. Ct. 770, 178 L. Ed.

14  2d 624 (2011).

15      Further, Petitioner has failed to establish prejudice with respect to his claim that

16  his trial counsel rendered ineffective assistance in connection with the motion to

17  suppress. "[I]n order to show prejudice when a suppression issue provides the basis for

18  an ineffectiveness claim, the petitioner must show that he would have prevailed on the

19  suppression motion, and that there is a reasonable probability that the successful motion

20  would have affected the outcome." Bailey v. Newland, 263 F.3d 1022, 1029 (9th Cir.

21  2001) (citing Kimmelman v. Morrison, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed. 2d

22  305 (1986)). Petitioner has failed to make this showing.

23      The California Court of Appeal's rejection of the ineffective assistance of counsel

24  claim was not contrary to nor an unreasonable application of federal law. 28 U.S.C. §

25  2254(d)(1). It is recommended that Petitioner's second claim of ineffective assistance of

26  counsel be denied.

27          5.    Failure to Present Clear and Coherent Defense

28      In Petitioner's final claim of ineffective assistance of counsel, Petitioner asserts

1 that counsel was ineffective based on the fact that counsel's closing argument was
2 rambling and incoherent. Petitioner argues that the closing argument was disjointed and
3 addressed several different defenses, including attacking Michael Jordan's credibility
4 regarding his statements against Petitioner, and also arguing that Petitioner could not
5 have obtained the requisite mental state due to severe intoxication. The Court finds that
6 counsel's arguments presented during the closing argument were reasonable, and did
7 not fall below the standards of professional conduct. Counsel presented argument
8 which, if believed, would have caused the jury to find Petitioner guilty of a lesser offense
9 or not guilty at all. While it is always possible with hindsight to find that counsel could
10 have performed better during closing arguments, it does not follow that counsel's
11 conduct was unreasonable. As the Supreme Court has stated:

12      Although courts may not indulge "post hoc rationalization" for
counsel's decisionmaking that contradicts the available evidence of
13   counsel's actions, Wiggins, 539 U.S., at 526-527, 123 S. Ct. 2527, 156 L.
Ed. 2d 471, neither may they insist counsel confirm every aspect of the
14   strategic basis for his or her actions. There is a "strong presumption" that
counsel's attention to certain issues to the exclusion of others reflects trial
15   tactics rather than "sheer neglect." Yarborough v. Gentry, 540 U.S. 1, 8,
124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) (per curiam). After an adverse verdict
16   at trial even the most experienced counsel may find it difficult to resist
asking whether a different strategy might have been better, and, in the
17   course of that reflection, to magnify their own responsibility for an
unfavorable outcome. Strickland, however, calls for an inquiry into the
18   objective reasonableness of counsel's performance, not counsel's
subjective state of mind. 466 U.S., at 688, 104 S. Ct. 2052, 80 L. Ed. 2d
19   674.

20 Harrington v. Richter, 131 S. Ct. 770, 790 (2011).

21      Again, Petitioner has not shown that counsel fell below a reasonable standard of
22 conduct or that Petitioner was prejudiced by counsel's performance. The California Court
23 of Appeal's rejection of the ineffective assistance of counsel claim was not contrary to
24 nor an unreasonable application of federal law. 28 U.S.C. § 2254(d)(1). It is
25 recommended that Petitioner's third claim of ineffective assistance of counsel be denied.

26 **IV.    RECOMMENDATION**

27      Accordingly, it is hereby recommended that the petition for a writ of habeas
28 corpus be DENIED with prejudice.

1        This Findings and Recommendation is submitted to the assigned District Judge,

2   pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after

3   being served with the Findings and Recommendation, any party may file written

4   objections with the Court and serve a copy on all parties. Such a document should be

5   captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply

6   to the objections shall be served and filed within fourteen (14) days after service of the

7   objections. The parties are advised that failure to file objections within the specified time

8   may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153

9   (9th Cir. 1991).

10

11  IT IS SO ORDERED.

12     Dated:   August 29, 2014          /s/ *Michael J. Seng*

13                               UNITED STATES MAGISTRATE JUDGE